IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
No. 4:25-CV-00207-BO-BM

| | | |
|---|---|---|
| ELLEN BRABO, *individually and d/b/a The Ell Hotel*, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | **ORDER** |
| CITY OF WASHINGTON, *a political subdivision of the State of North Carolina*, and DONALD SADLER *in his official and individual capacities*, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

This cause comes before the Court on plaintiff's motion to file supplemental pleading and plaintiff's motion for preliminary injunction, both filed on June 2, 2026 [DE 43; DE 45]. The City of Washington filed a response and a declaration regarding the motion for preliminary injunction on June 8, 2026 [DE 49; DE 50]. Donald Sadler filed a memorandum in opposition on the same day [DE 48]. The Court held a hearing on the preliminary injunction motion in Elizabeth City, North Carolina, on June 9, 2026. On June 23, 2026, defendants filed a response to plaintiff's motion for leave to file supplemental pleading [DE 53]. For the reasons explained below, the Court GRANTS plaintiff's motion for leave to file supplemental pleading and GRANTS plaintiff's motion for a preliminary injunction.

## I. BACKGROUND

Plaintiff, who is the current mayor of the City of Washington, North Carolina, and the owner of a bed & breakfast, filed this action against the City of Washington and the City's former

mayor, Donald Sadler. [DE 1]. Plaintiff filed the complaint in this Court on October 28, 2025. *Id.* The complaint alleges the following facts.

In the spring of 2021, plaintiff purchased the historic Bowers-Tripp House located at 1040 N. Market St., Washington, NC 27889, which is listed on the National Register of Historic Places. *Id.* at 2. Plaintiff purchased the House with the intention of renovating it and developing it into a bed & breakfast. *Id.* Although plaintiff purchased the House in her own name, she operates the business under the assumed name "The Ell Hotel." *Id.*

A City Board of Adjustment meeting occurred on July 15, 2021. *Id.* at 3. A City resident publicly voiced support for The Ell Hotel, stating, "Having this Bed & Breakfast on North Market Street will just amplify the effects of those that are already in place. We hope that you will grant this request. I know that [plaintiff] likes to have a lot of events, especially around the holidays." [DE 1] at 3.

That same day, the City of Washington issued a special use permit for plaintiff to operate The Ell Hotel as a "tourist home (bed & breakfast)." *Id.* at 2; [DE 1-2]. Her permit listed the City Zoning Ordinance's definitions for the terms "tourist home" and "bed & breakfast" as follows:

Sec. 40-25. - Words and terms defined:

*Tourist homes* means a dwelling wherein rooms are rented to provide overnight accommodations for transient guests; provided that the character of the dwelling is not changed and, in connection therewith, there is no display, no stock in trade nor commodity other than meals sold on the premises, and no person not a resident on the premises is employed specifically in connection with the accommodation of tourists.

*Bed and Breakfast* means a private home offering bed and breakfast accommodations to twelve (12) or fewer persons per night for a period of less than one (1) week. See Hotel or Motel.

[DE 1-2] at 4.

After receiving the permit, plaintiff began renovations on the Bowers-Tripp House. [DE 1] at 3. Plaintiff communicated openly with the City of Washington about her plan to host weddings, showers, fundraisers, and clubs at The Ell Hotel. *Id.* Her purpose in doing so was to put The Ell Hotel "on the map" as a tourist destination and to entice future overnight bookings. *Id.* At no time during the planning of The Ell Hotel did the City advise plaintiff that these types of events were not allowed. [DE 1] at 2.

On December 11, 2021, The Ell Hotel hosted a Christmas open house to show the progress on the renovations to the community. *Id.* Plaintiff marketed the event with yard signs and posters around the city. *Id.* at 3. City staff were aware of the event and did not issue a citation. *Id.* In fact, an employee of the City of Washington Tourism Department attended the event. *Id.*

On June 18, 2022, The Ell Hotel hosted a grand opening party attended by over 100 people, including the City Manager, a City Council member, the Director of the Chamber of Commerce, and the same employee of the Tourism Department. *Id.* at 4. The City did not issue a citation. [DE 1] at 4.

From August 2022 through February 2023, The Ell Hotel hosted at least 42 ticketed or contracted weddings, bridal showers, yoga classes, baby showers, political fundraisers, and book clubs, including a holiday tour in which hundreds of people purchased tickets to visit the property. *Id.* City staff were also aware of the activities and events hosted during those years and did not issue a citation. *Id.* Moreover, none of the weddings, showers, yoga classes, fundraisers, or club meetings resulted in any public complaints. *Id.*

For unknown reasons, in March of 2024, City staff presented a text amendment to the Planning Board to amend the City Zoning Ordinance's definition of "bed and breakfast" and to remove "tourist home" from the Ordinance. *Id.* In May of 2024, the City Planning Office presented

3

the proposed text amendment to City Council for a vote, and it passed unanimously. *Id.* at 5. The text amendment modified the definition of "bed and breakfast" in Section 40-25 to state:

> *Bed and breakfast (also formerly known as tourist homes)* means an owner occupied single-family dwelling offering overnight accommodations for transient guests, for a period of less than one (1) week. The occupancy is limited to twelve (12) guests per night, and the character of the dwelling must be maintained. Signs shall be in compliance with chapter 40, article XVI of this Code. The business cannot sell merchandise other than meals on the premises or employ more than one (1) part-time dedicated staff beyond the owner(s). **Private indoor only event services can be held exclusively for overnight occupancy guests, with an allowance of one (1) additional person per guest, up to a maximum of twenty-four (24) people. Outdoor events are not allowed.**

[DE 1-4] at 6 (emphasis added in bold); Washington, N.C., Code of Ordinances § 40-25. Neither The Ell Hotel nor any other bed & breakfast within the City of Washington were given notice of the text amendment's proposal or its passage. [DE 1] at 5–6.

Meanwhile, plaintiff was involved in local politics. *Id.* at 6. She was and is the local coordinator for a grassroots organization that opposes the North Carolina Department of Transportation's ("NCDOT") plan to widen 15th Street within the City. *Id.* Mayor Donald Sadler and the City Council are on record as being in favor of NCDOT's plan. *Id.* On April 14, 2025, plaintiff spoke at a City Council meeting and presented a petition bearing 485 signatures in opposition to NCDOT's plan. *Id.*

On April 16, 2025—just two days after speaking at the City Council meeting—The Ell Hotel received a notice of potential violation from the City of Washington Planning Office. *Id.* On April 30, 2025, plaintiff provided evidence refuting the violation. [DE 1] at 7. On or about May 8, 2025, The Ell Hotel received a "Courtesy Zoning Notification" from the City of Washington Planning Office, admonishing against plaintiff's advertisement for events that could accommodate up to fifty people. *Id.*; [DE 50-9] at 19.

4

During a May 12, 2025, City Council meeting, Mayor Donald Sadler asked the City Manager to investigate The Ell Hotel's parking and report back within ten days. [DE 1] at 7.

On May 21, 2025, plaintiff and another bed & breakfast owner attended a Tourism Development Authority Meeting to bring awareness of the impact the ordinance changes would have on the bed & breakfasts within the City. *Id.* When the other owner rose to speak during the public comment portion of the meeting, Mayor Donald Sadler cut him off and refused to hear him speak. *Id.*

On June 23, 2025, the City issued a second formal notice of violation for a family reunion hosted at The Ell Hotel on June 14, 2025. *Id.*; [DE 50-9] at 26–28.

Plaintiff decided to challenge Mayor Sadler by running in the November 2025 election. [DE 1] at 7. Plaintiff filed her candidacy for mayor on July 8, 2025. *Id.* at 8. Mayor Sadler commenced a campaign of retaliation against plaintiff and The Ell Hotel to intimidate his political opponent. *Id.* at 7. On or about the same day, after plaintiff filed her candidacy, Mayor Sadler and the City ordered police surveillance of plaintiff, which lasted from July 8 to July 20, 2025. *Id.* at 8–10.

On July 31, 2025, the City sent out a notice that it was intending to hold an evidentiary hearing on August 14, 2025, regarding whether to revoke The Ell Hotel's special use permit. *Id.* at 9. During that hearing, Detective Andrew Dawley from the City's Police Department testified under oath that he had never conducted private surveillance for the City's ordinance enforcement but did so regarding plaintiff and The Ell Hotel. *Id.* The City indefinitely tabled the revocation decision until after the November 2025 election. [DE 1] at 9. This concludes the factual allegations set forth in the complaint.

5

Plaintiff filed this lawsuit on October 28, 2025 [DE 1]. Her complaint sets forth claims against defendants pursuant to 42 U.S.C. § 1983 and North Carolina law, including: (1) First Amendment retaliation; (2) due process, void for vagueness; (3) due process liberty interest in business operations; (4) commercial speech violation; (5) equal protection; (6) First Amendment violation of free speech; and (7) ordinance preemption under North Carolina law. *Id.* at 10–23.

On December 22, 2025, defendant Donald Sadler filed a motion to dismiss for failure to state a claim, which is still pending as of the entry of this order [DE 17]. On December 23, 2025, defendant City of Washington filed a motion to dismiss for failure to state a claim, which is also still pending [DE 19].

On June 2, 2026, plaintiff filed a motion for leave to file supplemental pleading, pursuant to Federal Rule of Civil Procedure 15(d), setting out additional transactions, occurrences, and events that have occurred since she filed her complaint on October 28, 2025 [DE 43]. On the same day, plaintiff filed a motion for preliminary injunction pursuant to Federal Rule of Civil Procedure 65, to maintain the status quo and enjoin the City from revoking plaintiff's permit and from interfering with the operations of The Ell Hotel [DE 45]. Defendants responded to both motions [DE 48; DE 49; DE 53]. In her supplemental complaint, plaintiff provides the following alleged facts.

In November of 2025, plaintiff won the City of Washington's mayoral election, defeating Donald Sadler. [DE 43-1] at 2. Plaintiff was sworn into office on December 10, 2025. *Id.* at 2.

The next day, the Board of Adjustment voted to continue for four more months the hearing on the revocation of plaintiff's special use permit, adding that the City and plaintiff should actively confer in the interim for the purposes of brainstorming some mutually agreeable changes to the definition of bed & breakfast in the City's Ordinance. *Id.* at 2–3. Following the hearing, plaintiff

6

proposed a settlement to the City. *Id.* at 3. The City never responded to the settlement and never engaged plaintiff in any discussions about changes to the Ordinance. *Id.*

On May 7, 2026, the Board of Adjustment reopened the hearing on the revocation of The Ell Hotel's special use permit. *Id.* The Board of Adjustment's attorney refused to allow plaintiff to present any additional evidence to defend herself from alleged zoning violations. [DE 43-1] at 3. Ultimately, the Board voted unanimously to revoke plaintiff's permit and to deny plaintiff's appeal of the violations. *Id.* at 4.

The City's Ordinance requires a written decision before a revocation is effective. *Id.* None had yet been written in plaintiff's case. *Id.* Despite this, one day after the Board's vote, the City entered The Ell Hotel, where plaintiff's family lives, to enforce the revocation. *Id.* The instant motion to file supplemental pleading and the motion for preliminary injunction followed.

On June 9, 2026, a hearing was held before the undersigned in Elizabeth City, North Carolina, on the matter of the preliminary injunction. At the conclusion of the hearing, the Court indicated that the preliminary injunction would be granted and that the instant written order would be forthcoming. *See* [DE 51] "Minutes from Motion Hearing"; [DE 52] "Transcript of Preliminary Injunction Hearing" at 61 ¶ 24 – 62 ¶ 10.

## II. LEGAL STANDARD

"On motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." Fed. R. Civ. Pro. Rule 15(d). Leave to supplement "should be freely granted, and should be denied only where 'good reason exists . . . , such as prejudice to the defendants." *Franks v. Ross*, 313 F.3d 184, 198 n.15 (4th Cir. 2002) (quoting *Walker v. United Parcel Serv.*, 240 F.3d 1268, 1278 (10th Cir. 2001)).

7

"A preliminary injunction is an extraordinary and drastic remedy." *Munaf v. Geren*, 553 U.S. 674, 689 (2008) (quotation and citation omitted). Before a preliminary injunction may issue, a court must determine that the movant has demonstrated each of four elements: (1) that she is likely to succeed on the merits, (2) that she is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in her favor, and (4) that an injunction is in the public interest. *See Winter v. Natural Res.'s Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "The traditional office of a preliminary injunction is to protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits." *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003).

## III. DISCUSSION

For good cause, the Court hereby GRANTS plaintiff's motion for leave to file supplemental pleading, referring to both the complaint [DE 1] and the supplemental complaint [DE 43-1] as the full picture of pleadings before it.

Plaintiff's motion for preliminary injunction asks this Court to maintain the status quo by enjoining the City from revoking plaintiff's special use permit and from interfering with the operations of The Ell Hotel until the conclusion of this lawsuit. [DE 45; DE 46]. Based on plaintiff's showing of the four requisite elements for a preliminary injunction, the Court finds cause to grant plaintiff's motion.

1. Likelihood of Success on the Merits

The Court addresses likelihood of success in two parts. First, the Court discusses the elements of plaintiff's retaliation claim against the City, and second, the Court addresses defendant City of Washington's § 1983 argument.

8

i. First Amendment Retaliation

"The First Amendment right of free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005) (quoting *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000)).

First Amendment retaliation is "actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights." *ACLU of Ma., Inc. v. Wicomico County, Md.*, 999 F.2d 780, 785 (1993). "[C]onduct that tends to chill the exercise of constitutional rights might not itself deprive such rights, and a plaintiff need not actually be deprived of her First Amendment rights in order to establish First Amendment retaliation." *Constantine*, 411 F.3d at 500. Thus, the Fourth Circuit "ha[s] never held that a plaintiff must prove that the allegedly retaliatory conduct caused her to cease First Amendment activity altogether. The cause of action targets conduct that tends to *chill* such activity, not just conduct that *freezes* it completely." *Id.* (emphasis in original).

A plaintiff seeking to recover on a First Amendment retaliation claim must allege that "(1) she engaged in protected First Amendment activity, (2) the defendants took some action that adversely affected her First Amendment rights, and (3) there was a causal relationship between her protected activity and the defendants' conduct." *Id.* at 499.

Plaintiff alleges and the parties do not dispute that plaintiff engaged in protected activity when she presented a petition in opposition to NCDOT's street widening plan at the April 14, 2025, City Council meeting, when she filed candidacy for mayor, and when she filed this lawsuit. *See Steinburg v. Chesterfield Cnty. Plan. Com'n*, 527 F.3d 377, 385 (4th Cir. 2008) (right to speak at public meetings); *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 741 (1983) (right to file suit); *Washington v. Finlay*, 664 F.2d 913, 927–28 (4th Cir. 1981) (right to run for office).

9

Plaintiff has shown adverse action. A plaintiff suffers adverse action "if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Constantine*, 411 F.3d at 500 (quotation and citations omitted). Plaintiff alleges that defendants served her zoning violations, placed her under police surveillance, and revoked her special use permit. [DE 1] at 6–9; [DE 43-1] at 3–4. Such actions would likely intimidate and inhibit a person of ordinary firmness from engaging in protected activity such as running for office or opposing proposed city development plans. *See Constantine*, 411 F.3d at 500.

Plaintiff has also shown a causal connection between her protected activity (i.e., her City Council petition, mayoral candidacy, lawsuit filing) and the government's conduct. A showing of a causal connection requires "at the very least, that the defendant was aware of her engaging in protected activity." *Constantine*, 411 F.3d at 501. Here, there is no question defendants were aware of plaintiff's very public actions.

But, "[t]here must also be some degree of temporal proximity to suggest a causal connection." *Id.* Plaintiff has shown temporal proximity. First, plaintiff alleges that only two days passed between her presentation of a petition to defendants and her receipt of the first notice of potential violation. [DE 1] at 6. Second, she alleges that on or about the same day as she filed her mayoral candidacy, July 8, 20205, Donald Sadler ordered City police to surveille her. [DE 1] at 8. Third, plaintiff filed this lawsuit on October 28, 2025. [DE 1]. Since that filing, she won her mayoral campaign in November of 2025 and completed her swearing in as the new mayor on December 10, 2025. [DE 43-1] at 2. Plaintiff alleges that on December 11, 2025, the City of Washington's Board of Adjustment voted to continue the hearing on the revocation of plaintiff's special use permit, with the stated goal of actively engaging with plaintiff in the interim in order to confer about changes to the ordinance. *Id.* at 2–3. Although plaintiff followed through with her

10

efforts to accomplish that goal, the City allegedly ignored her until May 7, 2026, when it revoked her special use permit without allowing her to present any additional evidence. *Id.* at 3–4. The very next day, despite the lack of a written decision as required, the City physically appeared at plaintiff's bed & breakfast to enforce the revocation. *Id.* at 4. To the extent there was a "lengthy lapse of time" between plaintiff's lawsuit filing and the revocation, she has otherwise plausibly alleged that the City's actions "demonstrate retaliatory animus." *See Batchelor v. City of Wilson*, 747 F. Supp. 3d 845, 862 (E.D.N.C. Sep. 2024).

    i.  *Monell*

For a municipality to be held liable for a constitutional violation, such as First Amendment retaliation, a plaintiff must also show that the municipality "officially sanctioned or ordered" the allegedly retaliatory acts. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986). The City of Washington argues plaintiff cannot succeed on her retaliation claim because she has failed to show official action. [DE 20] at 14–20; [DE 49] at 20.

Municipalities "can be sued directly under [42 U.S.C.] § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978). For § 1983 purposes, a municipality may be held liable for official acts in one of four ways:

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifest [s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003).

"To be sure, 'official policy' often refers to formal rules or understandings . . . [that] establish fixed plans of action to be followed under similar circumstances consistently and over time." *Pembaur*, 475 U.S. at 480–81. However, single acts can also lead to liability under § 1983. *Id.* at 480–81. And, "[i]f the decision to adopt [a] particular course of action is properly made by that government's authorized decisionmakers, it surely represents an act of official government 'policy' as that term is commonly understood." *Id.* at 481. And "where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly." *Id.*

"A 'final policymaker' for the purposes of municipal liability is someone who has 'the responsibility and authority to implement final municipal policy with respect to a particular course of action.'" *Lytle*, 326 F.3d at 472 (quoting *Riddick v. Sch. Bd. of City of Portsmouth*, 238 F.3d 518, 523 (4th Cir. 2000)).

Plaintiff alleges the City Planning Director issued notices of violation to her, in retaliation. The City Ordinance explicitly gives the City Planning Director authority to issue these notices. *See* Washington, N.C., Code of Ordinances § 40-579, 580. However, the parties agree that the City's Board of Adjustment has the power to review the Director's actions. *See* § 40-580(c). And, when a municipal official's discretionary action "is subject to review by the municipality's authorized policymakers, [those policymakers] have retained the authority to measure the official's conduct for conformance with their policies." *Riddick*, 238 F.3d at 523 (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)). Therefore, the City Planning Director does not have final policymaking authority with respect to special use zoning compliance.

12

However, the City of Washington Board of Adjustment effectively reviewed and adopted the Planning Director's issuance of the violation notices in unanimously voting to officially revoke plaintiff's special use permit on May 7, 2026.

Whether the Board of Adjustment is the decisionmaker possessing final authority to establish municipal policy with respect to the administration and enforcement of special use permits is a question of state law. *See Pembaur,* 475 U.S. at 483. Our Supreme Court has emphasized:

> [t]he fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion. *The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable.* Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority . . . . [M]unicipal liability under § 1983 attaches where— and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.

*Id.,* 475 U.S. at 481–83 (emphasis added and citations omitted). "It is the municipality's policies, not the subordinate's departure from them, that must underlie liability . . . ." *Crowley v. Prince George's Cty., Md.,* 890 F.2d 683, 687 (4th Cir. 1989) (internal quotation marks omitted) (citing *Praprotnik,* 485 U.S. at 127).

Although it "may not be possible to draw an elegant line that will resolve [the] conundrum" of who possesses final policymaking authority, *Praprotnik,* 485 U.S. at 126–27, the following inquiries are helpful for resolving the issue: "(1) whether the official is constrained by policies of other officials or legislative bodies; (2) whether the official's decision on the issue in question is subject to meaningful review; and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority." *Hunter v. Town of Mocksville, N.C.,* 897

13

F.3d 538, 557 (4th Cir. 2018) (quoting *Valentino v. Village of S. Chicago Heights*, 575 F.3d 664, 676 (7th Cir. 2009)).

In *Hunter v. Town of Mocksville, N.C.*, three police officers asserted a § 1983 action against their town, alleging First Amendment retaliation. *Id.*, 897 F.3d at 543–44. After the officers reported their own department's corruption, the Chief of Police and Town Manager ("defendants") terminated the officers. *Id.* The trial court concluded the defendants were not final policymakers of the Town regarding the termination of the plaintiffs. *Id.* at 555. The Fourth Circuit disagreed, noting that the Town Board did not have a written personnel policy or any grievance procedure by which employees could challenge adverse employment actions imposed on them. *Id.* at 555–58. Instead, the Board had adopted an ordinance delegating to the Town Manager its statutory authority to set personnel policy for the Town, effectively conferring "carte blanche authority to make formal or informal ad hoc policy choices or decisions." *Id.* at 557 (internal quotation marks, citations, and italics omitted). Moreover, the Town had no formal review process for evaluating the Town Manager's termination decisions. *Id.* The Fourth Circuit concluded that the circumstances surrounding plaintiffs' termination presented "all the hallmarks of a final policymaker wielding her authority." *Id.*

Similarly, relevant municipal law in this case "makes clear that the [City] delegated to [the Board of Adjustment] final and unconstrained policymaking authority with regard to the challenged actions at issue." *Hunter*, 897 F.3d at 556. The Board of Adjustment hears all appeals regarding the City Planning Director's issuance of zoning violation notices. *See* § 40-512(a), 513, 580(c). The City's Zoning Ordinance delegates to the Board of Adjustment unilateral power to grant and revoke special use permits. *See* § 40-115, 117, 512(b), 581(f). Section 40-576(b) of the Zoning Ordinance specifically relieves City Council of any oversight duties regarding special use

14

permit revocation. *Id.* ("The duties of the City Council shall not include hearing and deciding questions of interpretation and enforcement [of the City Zoning Ordinance] that arise."). In fact, the Board's decision to grant or revoke a permit is not subject to review by any other municipal officials; the Board of Adjustment constitutes as its own Board of Appeals. *See* § 40-235, 236, 516. The only substantive parameters for the Board regarding revocation are the following instructions:

> Whenever the Board of Adjustment shall find, in the case of any permit granted pursuant to the provisions of these regulations, that any of the terms, conditions, or restrictions upon which such permit was granted are not being complied with, the Board shall rescind and revoke such permit . . . .
> \* \* \*
> Permits or certificates shall be revoked for any substantial departure from the approved application, plans, or specifications; refusal or failure to comply with the requirements of State or local laws; or false statements or misrepresentations made in securing the permit or certificate. Any permit or certificate mistakenly issued in violation of an applicable State or local law may also be revoked.

§ 40-117 "Revocation of permits."; § 40-581(f) "Remedies." (emphasis added).

Notably, the instructions list reasons for which the Board shall revoke special use permits. However, there are no substantive constraints on the Board's interpretation or administration of its power to revoke permits; interpretation of the Zoning Ordinance's provisions on enforcement is the responsibility of the City Planning Director, *see* § 40-575, but his decisions are subject to the Board's review. *See* § 40-580(c).

Effectively, the Board has carte blanche authority to grant or revoke permits at-will; its decisions are only subject to the courts. There is no formal review process for evaluating the lawfulness of the Board's administration of special use permits other than an appeal to the Board itself. In consideration all factors discussed, the Court finds the City has wholly delegated to the Board its authority to make final decisions as to the City's policy on special use permit administration and enforcement.

15

By voting to revoke plaintiff's special use permit, and denying her appeal, the Board officially sanctioned the City Planning Director's issuance of zoning violation notices. *See Pembaur*, 475 U.S. at 480. As the City's final decisionmaker regarding special use permit enforcement, the City is liable for the Board's actions.

It only being necessary that the Court find the City is likely liable for one retaliatory act, plaintiff has demonstrated she is likely to succeed on the merits of their claim. *See Salomon & Ludwin, LLC v. Winters*, 150 F.4th 268, 273 n.1 (4th Cir. 2025) ("finding a likelihood of success on only one claim is sufficient to justify injunctive relief.").

2. Irreparable Harm

The "key question" is "whether a preliminary injunction will prevent plaintiffs from suffering new or additional irreparable harm while they litigate this case to final judgment." *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, 172 F.4th 361, 372 (4th Cir. 2026). Plaintiff asserts she will suffer several irreparable harms without an injunction:

First, her business will be closed. [DE 46] at 26. The City has responded that, without an injunction, plaintiff is still allowed to operate as an "AirBnB" rental space. [DE 49] at 23. However, there is no question that plaintiff would be forced to cancel already-booked, large events, which will cause her considerable loss in revenue. Moreover, plaintiff has testified that the City's actions have already confused her clientele, who now think The Ell Hotel is closed for business—making it harder to market. [DE 52] at 15. The closure of plaintiff's business is an irreparable harm. *See, e.g., Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 520–21 (4th Cir. 2002) (upholding a finding of irreparable harm without injunction where the plaintiff faced a First Amendment violation as well as "the threat of a substantial fine and temporary suspension of [a] license . . . [and] the loss of valuable business opportunities"); *Paradies Shops, LLC v. Brookstone*

*Charlotte, LLC*, 2019 WL 6337818, at *5 (W.D.N.C. Nov. 26, 2019) (unpublished) ("[T]he imminent closure of a business, whatever the facts are related to its timing and provenance, is plainly an irreparable harm").

Second, plaintiff asserts her First Amendment rights have been violated. Plaintiff has shown she is likely to succeed on the merits of her First Amendment retaliation claim, thus she has demonstrated irreparable harm. *See Johnson v. Bergland*, 586 F.2d 993, 995 (4th Cir. 1978) ("Violations of [F]irst [A]mendment rights constitute per se irreparable injury."); *see e.g.*, *Legend Night Club v. Miller*, 637 F.3d 291, 302 (4th Cir. 2011) (affirming issuance of preliminary injunction where the threatened injury of license revocation "constituted direct penalization, as opposed to incidental inhibition of First Amendment rights, thus making it the sort that could not be remedied absent an injunction.") (citation and quotation marks omitted).

Third, plaintiff asserts she will likely face the loss of business reputation and customer goodwill. [DE 46] at 27–28. She represents to the Court that she has already lost one reservation due to publicity regarding the revocation hearing, and that if she is forced to call and cancel with customers who have booked events, it will irreparably tarnish the goodwill in which she has invested tens of thousands of dollars. *Id.*; [DE 52] at 16. This, too, constitutes irreparable harm. *See Saloman*, 150 F.4th at 278 n. 7.

Plaintiff is likely to suffer these irreparable harms without injunctive relief.

3. Balance of Equities & Public Interest

The Court considers the public interest and the balance of equities together. *Bernstein v. Sims*, 643 F. Supp. 3d 578, 588 (E.D.N.C. Dec. 1, 2022). Moreover, "[t]he public interest always lies with the vindication of constitutional rights." *Id.* (citing *Carandola*, 303 F.3d at 521).

17

Defendants assert a preliminary injunction would disserve the public interest because the large events hosted at plaintiff's bed & breakfast have caused the surrounding public streets to be cluttered with parked cars, which can block traffic, including emergency vehicles. [DE 49] at 24. However, plaintiff testified at the preliminary injunction hearing that she has asked the City to install "no parking signs" on the public streets—which she does not control—and the city has declined to do so. [DE 52] at 56. Even more notably, plaintiff also testified she had newly purchased a nearby lot which would be available to her guests for parking starting on June 27, 2026. *Id.* at 42–43.

Defendants also assert noise concerns, characterizing the noise that comes from the events at the bed & breakfast as "out of character for the surrounding residential neighborhood." [DE 49] at 24; [DE 50] at 5. Without more, this evidence does not persuade the Court to find that an injunction would harm the public interest.

On the contrary, plaintiff has shown that her business benefits the surrounding community. She has preserved and renovated the only historic landmark in the City of Washington, [DE 1] at 2–3, [DE 52] at 4, created a tourist destination, and established a nationally renowned business fitting to the character of her City. [DE 46-1] at 2–3; [DE 52] at 16, 23, 39. Her bed & breakfast boosts the local economy and provides a venue for local charitable and political causes, among others. [DE 1] at 4; [DE 52] at 16, 34, 39.

Moreover, defendants' actions tend to chill plaintiff's First Amendment rights. "First Amendment rights are not private rights . . . so much as they are rights of the general public." *Machesky v. Bizzell*, 414 F.2d 283, 289 (5th Cir. 1969). While courts are not mechanically obligated to grant an injunction for every potential violation of law, *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982), this Court considers weightily the need to assure the

"unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Bernstein*, 643 F. Supp. 3d at 589 (quoting *Connick v. Myers*, 461 U.S. 138, 145 (1983); *Roth v. United States*, 354 U.S. 476, 484 (1957)).

This Court is persuaded that the balance of equities tips in plaintiff's favor and an injunction is in the public interest.

4. Security

Pursuant to Rule 65(c) of the Federal Rules of Civil Procedure, the Court must consider whether plaintiff should provide security in an amount sufficient to pay the costs and damages sustained by any party found to have been wrongfully enjoined. No party having briefed this issue, the Court conducts its own review of the facts and circumstances to determine whether, in its discretion, a security is appropriate. The Court finds that a nominal bond in the amount of $100 is appropriate in this instance.

5. Status Quo

"The purpose of [a] preliminary injunction is to preserve the status quo until the rights of the parties can be fairly and fully investigated and determined by strictly legal proofs and according to the principles of equity." *Wetzel v. Edwards*, 635 F.2d 283, 286 (1980) (quoting *Meiselman v. Paramount Film Distrib. Corp.*, 180 F.2d 94, 97 (4th Cir. 1950)). The status quo is "the last uncontested status between the parties which preceded the controversy." *League of Women Voters of N.C. v. N.C.*, 769 F.3d 224, 236 (4th Cir. 2014) (citation omitted). Accordingly, the last uncontested status between the parties is reflected by the time period of August 2022 through February 2023, when plaintiff hosted showers, weddings, clubs, political events, book clubs, holiday parties, and other events of the like at The Ell Hotel without complaint, citation, or interference from defendants.

## IV. CONCLUSION

For the foregoing reasons, plaintiff's motion to file supplemental pleadings [DE 43] and motion for preliminary injunction [DE 45] are GRANTED. Plaintiff is ORDERED to provide security to the Court in the amount of $100 not later than August 17, 2026. Until the resolution of this action, defendants are ENJOINED from enforcing the revocation of plaintiff's special use permit and from interfering with or penalizing plaintiff's activities that are in conformity with the above-recited status quo at The Ell Hotel.

SO ORDERED, this **17** day of July, 2026.

TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE

20